

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| LUCINDA G. MILLER, ELAINE KING MILLER §§§§ Plaintiffs, §§ v. §§ TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER §§§§ Defendant. § | 2-00CV-0364J |

## AMENDED COMPLAINT

COME NOW, Plaintiffs Lucinda G. Miller and Elaine King Miller alleging as follows:

### I. IDENTIFICATION OF PARTIES

1.  Plaintiff Lucinda G. Miller ("Miller") is a former Professor of Pharmacy Practice at the Texas Tech School of Pharmacy ("SOP"). Miller was employed by the SOP as a Professor of Pharmacy Practice from August 1997 until March 24, 1999. Miller is a resident of Amarillo, Texas.

2.  Plaintiff Elaine King Miller ("King Miller") has been a Professor of Pharmaceutical Sciences at the SOP since August 1997. King Miller is a resident of Amarillo, Texas.

3.  Defendant Texas Tech University Health Sciences Center ("TTUHSC") is an independent institution of higher education governed by the Board of Regents of Texas Tech University. Texas Education Code Ann. § 110.01. Its chief executive officer is the Chancellor of Texas Tech University. The SOP, which is located at 1300 Coulter Drive, Amarillo, Texas 79106,

**AMENDED COMPLAINT**                                            Page 1

*34*

is a part of the TTUHSC. The TTUHSC may be served by serving it chief executive officer, the Chancellor of Texas Tech University, John Montford.

## II. JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 2201 and 2202; 42 U.S.C. § 2000e; and 29 U.S.C. §§ 206, 794.

5.      Venue is proper in the Northern District of Texas, Amarillo Division, because the discriminatory actions taken against Miller and King Miller occurred in Amarillo, Texas.

## III. PREREQUISITES TO SUIT

6.      Miller filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 15, 1999. Pursuant to the Worksharing Agreement between the EEOC and the Texas Commission on Human Rights ("TCHR"), Miller's EEOC complaint was also filed with the TCHR. She received her right to sue letter from the EEOC on or about August 19, 2000. This complaint is brought within ninety days of Miller's receipt of her right to sue letter and within two years of the date she filed her TCHR claim. All administrative prerequisites to suit have been satisfied.

7.      King Miller filed her Charge of Discrimination with the EEOC on April 15, 1999. Pursuant to the Worksharing Agreement between the EEOC and the TCHR, King Miller's EEOC complaint was also filed with the TCHR. She received her right to sue letter from the EEOC on or about August 19, 2000. This complaint is brought within ninety days of King Miller's receipt of her right to sue letter and within two years of the date she her filed TCHR claim. All administrative prerequisites to suit have been satisfied.

8.      King Miller filed a second charge of discrimination with the EEOC on March 10, 2000. Pursuant to the Worksharing Agreement between the EEOC and TCHR, King Miller's EEOC complaint was also filed with the TCHR. This charge of discrimination was amended on October 25, 2000 and March 6, 2001. King Miller received a dismissal and notice of right to sue letter from the EEOC on March 27, 2001. This complaint is filed within ninety days of King Miller's receipt of her notice of right to sue and within two years of the date she filed her TCHR claim. All administrative prerequisites to suit have been satisfied.

## IV. ALLEGATIONS COMMON TO ALL CLAIMS

### A.      THE INTERVIEW PROCESS AND PROMISES MADE DURING THE INTERVIEW PROCESS

9.      In October 1996, Miller was asked by Dr. Cynthia Raehl ("Raehl") of the SOP to interview for an academic position with the SOP. Raehl told Miller that she had contacted Miller because Raehl had read an article where Miller was one of the authors. When Raehl contacted Miller, Miller was an Associate Professor of Pharmacy at the Nebraska School of Pharmacy in charge of the Nebraska Drug Information Network.

10.     After further discussions, Raehl asked Miller to come to Amarillo to interview for a professor position at the SOP. During the interview process, Miller made it clear she wanted to be on a tenure track and she would not accept the position if she was not on a tenure track. The Dean of the SOP, Arthur Nelson, Jr. ("Nelson"), assured Miller she would be placed on the tenure track and she would be considered for tenure as early as possible. Raehl informed Miller that she would be given tenure immediately. As Miller was leaving to return to Nebraska, Raehl shook Miller's hand and told her that tenure would be no problem.

AMENDED COMPLAINT                                                                                          Page 3

11.     During the interview process, Miller also discussed what her salary would be if she accepted the position. Raehl informed Miller that she was prohibited from paying her more than $72,000 in base salary and $5,000 as an administrative stipend, though Miller later discovered that other professors of equivalent rank, skill, and experience were paid more.

12.     In April 1997, King Miller contacted Raehl to inquire about a job announcement for a position as Associate Dean for Student Outcomes Assessment ("OA") at the SOP. Raehl asked for and received King Miller's curriculum vitae. Shortly thereafter, Nelson contacted King Miller and asked her to come to Amarillo to interview for the Associate Dean position, which King Miller agreed to do. When King Miller was invited to interview for the Associate Dean position, she was a tenured associate professor of management at Colorado State University.

13.     During the interview in Amarillo, King Miller asked Nelson if she would be tenured upon arrival at the SOP. Nelson told King Miller that it was against school policy to grant automatic tenure to professors coming from an associate professor position, but he also told King Miller to apply for an exception to this policy and that he would support such an application for exception. Moreover, Nelson assured King Miller that if she was not tenured upon arrival, he would support King Miller's obtaining early tenure.

14.     During the interview process, King Miller asked about her job responsibilities, and she was informed that her primary responsibility would be to establish and implement the SOP's OA program. Nelson informed King Miller that she would not have any teaching or research duties unless she wanted them.

**AMENDED COMPLAINT**                                                                      **Page 4**

15. King Miller also asked about her salary during the interview process. Nelson told King Miller that he was prohibited from paying her more than $70,000, plus a $5,000 administrative stipend, even though King Miller discovered that other associate deans were paid more.

**B. ACCOMPLISHMENTS AT THE SCHOOL OF PHARMACY**

16. In March 1997, Miller accepted a position as a Professor of Pharmacy Practice with the SOP. She began her duties at the SOP in August 1997. Even though Miller was told by both Raehl and Nelson that she would be on the tenure track, Raehl signed a Personnel Action Form listing Miller as non-tenure track, and Nelson sent a memorandum to the President of the TTUHSC stating that Miller was on a non-tenure track.

17. During the 1997-1998 and 1998-1999 academic years, Miller carried a full teaching load and published several scholarly articles. She was asked to be the founding editor of a new scholarly journal, the Journal of Herbal Pharmacotherapy, and she established a clinical program for the SOP in conjunction with the TTUHSC Department of Family Practice. Miller served on eight committees and was chairperson of five of them. In addition, Miller served as Interim Associate Dean for Clinical Research during 1997 and 1998.

18. King Miller accepted the position as Associate Dean for OA with the SOP in the spring of 1997 and reported for work at the SOP in August 1997. Although her job description did not require her to teach any classes, and she was told that she would not have to teach any classes unless she wanted to, King Miller agreed to teach two courses during the 1997-1998 school year and seven courses during the 1998-1999 school year. In addition to her teaching duties, King Miller was responsible for giving the OA test on an expedited basis to all the SOP students in January 1998 and restructuring the entire OA program to make it functional for the OA test scheduled for March 1999.

In addition to her other responsibilities, King Miller was responsible for faculty development seminars, administrative support to SOP committees, sat on numerous SOP and TTUHSC committees, was a member of the State of Texas Board of Pharmacy Committee, and presented her SOP research at national meetings.

## C.    THE 1998 TENURE REVIEW PROCESS AND RESULTS

19.    In accordance with the Board of Regents' policy and the SOP tenure policies, in August 1998, Miller submitted her tenure application to Raehl, the Chair of the Pharmacy Practice Department at the SOP. At the time she submitted her tenure application, Miller was the author of over eighty scholarly publications, sixty-one of which she was the primary author. Thirty of Miller's articles were in medical journals, and she was the author of several book chapters and one book. She had received an outstanding teacher of the year award and received competitive teaching-related grants. She had also received $480,000 in grant money and had one patent and one copyright. In addition, she was a recognized national expert in herbal pharmacotherapy, and served on several national committees. Furthermore, in February 1998, Miller received a favorable performance review from Raehl.

20.    In accordance with the Board of Regents' policy and the SOP tenure policies, in August 1998, King Miller submitted her tenure application to Dr. Quentin Smith, the Chair of the Pharmaceutical Sciences Department at the SOP. At the time she submitted her tenure application, King Miller was the author of numerous publications, including a nationally recognized three-volume series on managed care. She was formerly a tenured associate professor of management at Colorado State University, and she had more than twenty years of higher academic teaching and administration management experience. King Miller was a member of several prestigious national

boards, including the American Medical Association Liaison Committee on Medical Education. Furthermore, King Miller received a favorable performance review from Nelson in February 1998.

21.     Upon information and belief, the only other professor eligible to go up for tenure, Roland Patry, did not timely submit his tenure application. He was, nevertheless, allowed to participate in the tenure process.

22.     The SOP tenure process is composed of several stages. The first stage is the departmental review stage where all tenured professors in the tenure applicant's department (pharmaceutical sciences or pharmacy practice) vote on whether the tenure applicant should be granted tenure. The second stage is a review by the tenure applicant's department chair. The third stage is a review of the tenure application by the SOP's Faculty Affairs, which is composed of six faculty members and two student members. Each member of the Faculty Affairs Committee receives one vote, except for the two students, who each receive a half of a vote. After a vote by the Faculty Affairs Committee, the tenure application is forwarded to the Dean of the SOP. The Dean of the SOP reviews the tenure application and then forwards his recommendation to the President of the TTUHSC. The President of TTUHSC forwards his and the TTUHSC's tenure recommendation to the Chancellor of Texas Tech University, who forwards his recommendation on tenure to the Texas Tech University Board of Regents, which makes the final decision on whether to grant tenure to the tenure applicant.

23.     While King Miller's, Miller's, and Patry's tenure applications were pending, numerous procedural irregularities occurred in the tenure process. For example, Associate Dean C.A. Bond, Chairman of the Faculty Affairs Committee, addressed the SOP Faculty Affairs Committee and informed it that Patry's tenure application would receive a "smooth highway" but

King Miller's and Miller's tenure applications would not receive the same treatment, or words to that effect. Miller twice submitted documents establishing her continuing scholarly activity, but the documents were not included as part of her tenure application. And King Miller was given inconsistent answers by Nelson, Quentin Smith, and C.A. Bond as to what information she needed to include in her tenure application.

24.    In addition to the numerous procedural irregularities occurring during the tenure process, the SOP's decision to deny King Miller and Miller tenure was inconsistent with the opinion of the great majority of outside reviewers, who favorably commented on Miller's and King Miller's tenure applications.  Both Miller and King Miller were praised by other scholars and several specifically noted that King Miller and Miller would be eligible for tenure at their respective institutions.

25.    In February 1999, Miller and King Miller were denied tenure and Roland Patry was granted tenure.

26.    While the three professors' tenure applications were pending, the organization that accredits schools of pharmacy issued an accreditation report on the SOP.  The report commended the SOP for its efforts in outcomes assessment.

27.    In December 1998, Miller and King Miller discovered that female faculty members were not receiving the same salary and administrative stipends as their male counterparts. Both King Miller and Miller complained to Nelson about the salary disparity.  In December 1998, Miller had a meeting with David Smith, the President of TTUHSC, and Nelson in Lubbock concerning this issue, as well as irregularities in the tenure process.

**AMENDED COMPLAINT**                                                                          **Page 8**

## D.    EVENTS OCCURRING AFTER THE DENIAL OF TENURE

28.    Shortly after complaining about gender discrimination to Nelson and David Smith, Miller was denied tenure, given a sham performance appraisal, and was criticized for not attending a meeting about which she was not told. In addition, in December 1998, Miller was denied reimbursement for travel expenses for attending a meeting with David Smith to discuss Miller's allegations of gender discrimination. She was subject to numerous instances of hostility by other faculty members at the SOP. In total, Nelson and other members of the faculty at the SOP made conditions so unbearable for Miller after she made her charge of discrimination that she had no choice but to resign her position as professor. In March 24, 1999, because of continual harassment by Nelson, Raehl, and others within the SOP, Miller was forced to resign her position with the SOP.

29.    After King Miller complained about gender discrimination occurring at the SOP, Nelson became more critical of her supervision of the OA program, no longer assigned her as acting Dean when he was off campus, treated King Miller differently regarding professional travel budget and reimbursement, and began giving King Miller negative performance appraisals. These negative performance appraisals were allegedly the basis for Nelson's decision not to give King Miller a merit pay raise. In addition, Nelson began taking away King Miller's responsibility for the OA program and giving it to Associate Dean Robert Supernaw. Ultimately, King Miller was demoted from Associate Dean for OA to a Professor of Pharmaceutical Sciences and stripped of her responsibilities for the OA program.

30.    In April 1999, Miller and King Miller filed charges of discrimination with the EEOC. Miller and King Miller received their respective right to sue letters on or about August 19, 2000.

31.     In July 1999, King Miller was contacted by professors at the University of Colorado Health Sciences Center about a collaborative effort on outcomes assessment using the SOP OA Program as the model.

32.     In July 1999, King Miller again applied for tenure with the SOP. Despite being qualified for tenure, King Miller was denied tenure. However, two male associate professors with substantially less academic experience and relevant qualifications were granted tenure.

33.     In April 1999, King Miller was diagnosed as legally blind. From April 1999 through the present, King Miller's vision has continued to deteriorate. Her vision problems have required her to use adaptive equipment and to seek reasonable accommodations so that she can continue with her work at the SOP. She is currently legally blind.

34.     Even though King Miller provided medical documentation of her condition to the TTUHSC and explained her condition and its attendant consequences to Nelson on numerous occasions, Nelson told several persons within the SOP that King Miller was not blind and that she was "faking it."

35.     As King Miller's vision continued to deteriorate, she asked Nelson on numerous occasions to meet with her to discuss reasonable accommodations so that she could continue her teaching and administrative duties. Nelson repeatedly refused to meet with her, contending that he required medical documentation supporting her condition before he could discuss her request for accommodation. Nelson took this position even after King Miller had provided a July 21, 1999 letter from the Texas Commission for the Blind's regional consultant, William D. Townsend, O.D., who discussed King Miller's condition and her need for adaptive equipment and accommodations in her workplace.

**AMENDED COMPLAINT**                                                                   **Page 10**

36.     On January 14, 2000, King Miller received a letter from Nelson advising her that she was being demoted from her position as Associate Dean for OA to a Professor of Pharmaceutical Sciences.

37.     After her second tenure application was denied in February 2000, King Miller received a letter from Nelson informing her that her appointment as a professor with the SOP would terminate in July 2001.

## V.  TITLE VII AND TEXAS LABOR CODE CLAIM

38.     At all times material to this action, Defendant TTUHSC employed in excess of 500 employees.

39.     Miller and King Miller allege that Defendant TTUHSC engaged in, and continues to engage in, a continuing pattern and course of discriminatory conduct against them throughout their respective terms of employment with the SOP because of their sex, disability, and in retaliation for their opposition to discriminatory employment practices.  Miller and King Miller allege that Defendant TTUHSC engaged in these and other actions of a discriminatory nature in violation of Title VII and the Texas Labor Code Ann. § 21.001, *et. seq*, ("TCHRA") in that:

A.     Defendant TTUHSC, through its agents, supervisors and/or employees, in a continuing course of conduct, discriminated against Miller and King Miller in the terms, conditions, and privileges of employment by failing to award each of them tenure when both Miller and King Miller were qualified for tenure;

B.     Defendant TTUHSC, through its agents, supervisors and/or employees, in a continuing course of conduct, discriminated against Miller and King Miller in the terms, conditions, and privileges of employment by paying Miller and King Miller less than their male counterparts;

AMENDED COMPLAINT                                                          Page 11

C. Defendant TTUHSC, through its agents, supervisors, and/or employees, in a continuing course of conduct, retaliated against Miller and King Miller for complaining about the gender discrimination and disability discrimination at the SOP and for asserting their civil rights;

D. Defendant TTUHSC, through its agents, supervisors, and/or employees, in a continuing course of conduct, discriminated against Miller in the terms, conditions, and privileges of employment by creating such an oppressive, retaliatory, and hostile environment as to amount to the constructive discharge of Miller;

E. Defendant TTUHSC, through its agents, supervisors, and/or employees, in a continuing course of conduct, discriminated against King Miller in the terms, conditions, and privileges of employment by demoting King Miller from the position of Associate Dean for OA to a Professor of Pharmaceutical Sciences;

F. Defendant TTUHSC, through its agents, supervisors, and/or employees, in a continuing course of conduct, discriminated against King Miller in the terms, conditions, and privileges of employment by failing to award King Miller a merit pay raise when she was qualified for such;

G. Defendant TTUHSC, through its agents, supervisors, and/or employees, in a continuing course of conduct, discriminated against King Miller in the terms, conditions, and privileges of employment by placing King Miller on a one-year terminal contract, which ends in July 2001;

H. Defendant TTUHSC, through its agents, supervisors and/or employees, in a continuing course of conduct discriminated against King Miller in the terms, conditions, and privileges of employment by failing to reasonably accommodate King Miller's visual disability; and

I.      Defendant TTUHSC, through its agents, supervisors, and/or employees in a continuing course of conduct subjected King Miller to a hostile work environment based on her disability.

40.     The SOP engaged in the conduct described above with malice or reckless indifference to the Title VII and TCHRA rights of Miller and King Miller.

## VI. REHABILITATION ACT CLAIM

41.     The allegations of Paragraphs 1-40 are re-alleged and incorporated herein.

42.     This claim is brought pursuant to Section 504 of the Rehabilitation Act (29 U.S.C. § 794) to redress the SOP's discriminatory treatment of King Miller on the basis of her disability--blindness and to redress the hostile work environment to which King Miller was subjected because of her disability.

43.     Upon information and belief, the SOP and TTUHSC receive federal financial assistance as institutions of higher education.

44.     King Miller is legally blind and is a disabled individual within the meaning of 29 U.S.C. § 706(8).

45.     Beginning in the Spring of 1999, King Miller began to notice a significant decrease in her vision. The decrease in vision is ongoing.

46.     After being diagnosed with Stargardt's disease in April 1999, King Miller was examined by Dr. William D. Townsend, O.D. On July 21, 1999, Dr. Townsend, sent a letter to the TTUHSC advising the manager of the Human Resources Department for the TTUHSC, DeVonna Smith, that King Miller had a visual disability, but that she "would like to continue in her present

position as Assistant [sic] Dean in the Texas Tech Pharmacy School." Dr. Townsend's letter also made recommendations to accommodate for King Miller's vision loss.

47.     Throughout the Fall of 1999, King Miller attempted to advise Nelson and David Fry, the Director of ADA Services for the TTUHSC, of the accommodations she would need to continue in her position. Nelson refused to discuss the issue of accommodation until King Miller agreed to provide medical records supporting her disability. When King Miller asked Nelson to provide her with the policies and procedures that would allow him to obtain her medical records, particularly in light of the letter from Dr. Townsend setting out her condition and her needs, Nelson failed and refused to provide a response, but nevertheless continued requesting medical records.

48.     On or about January 14, 2000, King Miller received a letter from Nelson in which he demoted her from Associate Dean for OA to a Professor of Pharmaceutical Sciences. The reason for this demotion was because of Defendant TTUHSC's discrimination against King Miller on account of her disability.

49.     In or about March 2001, Quentin Smith and others within the SOP and TTUHSC began requiring King Miller to report daily the time she arrived at the SOP and when she left the SOP for the more than an hour. Upon information and belief, no other employee with the SOP is or has been required to make such reports, except to report extended absences from the SOP. In April 2001, King Miller was advised by Dr. Quentin Smith that she could not take Braille classes during normal business hours, although there is no specific TTUHSC policy that prevents an employee from taking time away from work to engage in needed medical training. King Miller was also advised that she would not be provided assistive training to allow her to use her assistive equipment, but TTUHSC later relented and provided some of the necessary training. Finally, even

**AMENDED COMPLAINT**                                                                                **Page 14**

after repeated requests to properly install the software for her adaptive equipment on her computer, almost two years after she requested it, so that she could perform her work at the SOP, Defendant has failed to satisfactorily install the software and repair her computer equipment.

50.     At all times material to this action, King Miller was able to perform the duties of Associate Dean for OA had she been provided reasonable accommodation and not subjected to a hostile work environment. Defendant TTUHSC, through its agents, supervisors, and/or employees failed and refused to provide King Miller with reasonable accommodation and subjected her to a hostile work environment in violation of the Rehabilitation Act of 1973.

## VII. EQUAL PAY ACT CLAIM

51.     The allegations of Paragraphs 1-50 are re-alleged and incorporated herein.

52.     This claim arises under the Equal Pay Act, 29 U.S.C. § 206(d), to recover wages due to Miller and King Miller and an equal amount as liquidated damages, as well as attorney's fees. Written consents of each of the Plaintiffs, as required by 29 U.S.C. § 216(b), shall be filed before the time within which Defendant has to file an answer.

53.     Miller was a Professor of Pharmacy Practice at the SOP, and King Miller is currently a Professor of Pharmaceutical Sciences at the SOP.

54.     Defendant TTUHSC is an agency of the State of Texas and is a public agency as that term is defined in 29 U.S.C. § 203(x).

55.     Defendant TTUHSC, through its agents, supervisors, and/or employees, since August 1997, has repeated and willfully violated 29 U.S.C. § 206(d), and continues to repeatedly and willfully violate 29 U.S.C.§ 206(d), by discriminating between employees on the basis of gender by paying wages and benefits to Miller and King Miller at rates less than the rates at which it pays

wages and benefits to male employees for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions.

**WHEREFORE,** Plaintiffs Miller and King Miller pray that the Court grant the following relief from Defendants:

A.     A declaratory judgment, declaring that Defendant's past practices herein complained of to be unlawful under Title VII, the TCHRA, the Equal Pay Act, and the Rehabilitation Act;

B.     A permanent injunction, enjoining Defendants from continuing to discriminate against Plaintiffs on account of their sex, disability, or opposition to the discriminatory practices of Defendants in violation of Title VII, the TCHRA, the Rehabilitation Act, or the Equal Pay Act;

C.     Back pay, front pay, retirement benefits, retroactive tenure, health benefits, and any other relief necessary to compensate Plaintiffs for their damages pursuant to Title VII and TCHRA claims;

D.     Injunctive relief in the form of restoring Dr. Elaine King Miller to her position as Associate Dean for Outcome Assessment, or alternatively, as a Professor of Pharmaceutical Science restoring Dr. Lucinda Miller to her position as a Professor of Pharmacy Practice;

E.     Awarding Dr. Elaine King Miller tenure and Dr. Lucinda Miller tenure;

F.     Compensatory damages for the violation of Plaintiffs' rights under Title VII and the TCHRA;

G.     Provision of sex and disability discrimination training of the employees of Defendant by a service specializing in such training;

H.    Attorneys' fees and costs necessary for the prosecution of Plaintiffs' Title VII and TCHRA claims;

I.    Back pay and compensatory damages for Defendant's violations of the Rehabilitation Act, and attorney's fees and costs incurred in prosecuting Plaintiff King Miller's Rehabilitation Act claim;

J.    Provision of adaptive equipment and training sufficient to allow King Miller to continue her teaching and administrative duties at the School of Pharmacy;

K.    Back pay, liquidated damages in an amount equal to the back-pay award, and attorney's fees and costs incurred in prosecuting Plaintiffs' Equal Pay Act claims against Defendant;

L.    Prejudgment interest at the legally prescribed rate from the date of the violations until judgment, as well as post-judgment interest as applicable; and

M.    Such other and further relief as the Court deems proper.

**JURY DEMAND**

56.    Plaintiff demands a jury on all claims, including, but not limited to, the ultimate issues of fact as to the merits of the dispute, back pay, front pay, employee benefits, and compensatory and punitive damages, excepting the attorney's fees issues.

**AMENDED COMPLAINT**    Page 17

Respectfully submitted,

**BROWN & FORTUNATO, P.C.**
Bradley W. Howard
State Bar No. 00786452
Grant A. Bannen
State Bar No. 00793300
905 South Fillmore, Suite 400
Amarillo, Texas 79105-9418
Tel:    (806) 345-6300
Fax:    (806) 345-6363

By:_____
    Grant A. Bannen

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _____ day of _____, 2001, a true and correct copy of the above and foregoing instrument was sent via facsimile and via certified mail, return receipt requested to the following counsel of record:

David E. Jenkins
Assistant Attorney General
General Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548

_____
Grant A. Bannen

<u>**AMENDED COMPLAINT**</u>                                                    **Page 18**