

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| ELAINE KING MILLER and | § | |
| LUCINDA G. MILLER, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | NO. 2-00CV-0364J |
| | § | |
| | § | |
| TEXAS TECH UNIVERSITY HEALTH | § | |
| SCIENCES CENTER, | § | |
| | § | |
| Defendant | § | |

## JOINT PRETRIAL ORDER

## I. PENDING MOTIONS

The following motions are pending: Defendant's *Amended Motion to Dismiss,* Defendant's

*Motion for Summary Judgment and Brief in Support* and Plaintiffs' *Motion for Leave to file Sur-*

*Reply to Defendant's Amended Motion to Dismiss and Brief in Support of Plaintiffs' Sur-Reply.*

Jurisdictional Questions include:

1.      Whether the Court has subject matter jurisdiction over Plaintiffs' Texas Labor Code claims

of sex discrimination and retaliation, and Plaintiff King-Miller's labor code claim of disability

discrimination?

2.      Whether the court has subject matter jurisdiction over Plaintiff King-Miller's disability

claims brought under Title VII?

3.      Whether the Plaintiffs are entitled to claim punitive damages?

110

4.    Whether the Court has jurisdiction over Plaintiff King-Miller's claim under section 504 of the Rehabilitation Act?

## II.  SUMMARIES OF CLAIMS AND DEFENSES

### A.    Summary of Claims of Plaintiff Miller

Plaintiff Miller was asked by Dr. Cynthia Raehl to apply for a faculty position at the SOP. While Plaintiff Miller was interviewing for the position, she stated that she wanted to ensure that she would receive tenure if she were to accept a position at the Texas Tech University Health Sciences Center School of Pharmacy ("SOP"). She was assured by Dr. Raehl that tenure would be no problem and that she would be put up for tenure right away. Plaintiff Miller also inquired about a higher salary when deciding whether to accept the position and was told that the SOP could not pay more than $72,000 plus a $5,000 stipend that was being offered. Ultimately, Plaintiff Miller accepted a position with the SOP as a full professor and Vice-Chair of the Pharmacy Practice Department.

Upon her arrival at the SOP, Plaintiff Miller discussed applying for tenure with Dr. Raehl. Plaintiff Miller was advised that she should wait until the next tenure cycle to apply for tenure, which she reluctantly agreed to do.

During the fall 1997 semester and spring 1998 semester, Plaintiff Miller performed her job duties exceptionally well. Among other things Plaintiff Miller continued to be a prolific scholarly writer. She was actively involved in the presentation and refinement of several classes. She was responsible for organizing and implementing the SOP's new Basic Clinical Skills Clerkship program. She facilitated a relationship with the medical school in family medicine. And she acted as Interim Associate Dean for Clinical Research, as well as serving on several committees.

Dr. Raehl, her supervisor, was pleased with Plaintiff Miller's performance. In February 1998, she rated Plaintiff Miller a four out of five on Plaintiff Miller's performance review. Dr. Raehl also complimented Plaintiff Miller on her service to the SOP and on many occasions referred to the fact that Plaintiff Miller was a model for younger faculty or that the SOP was lucky to have her.

Plaintiff Miller applied for tenure in July 1998. At the time she applied for tenure, Plaintiff Miller had numerous scholarly articles published, had a large amount of grant funding, and was an excellent teacher. In short, she exceeded the criteria for tenure at the SOP. At the first level of review, Dr. Robert Supernaw voted in favor of Plaintiff Miller for tenure.

Although Dr. Raehl spoke highly of Plaintiff Miller prior to Plaintiff Miller's tenure application, she recommended against Plaintiff Miller's tenure application. The reasons asserted by Dr. Raehl for voting against Plaintiff Miller are fabricated and are rebutted by her own earlier statements.

The next step in the tenure review process was the Faculty Affairs Committee vote. The Faculty Affairs Committee members, who were junior faculty members and students, with the exception of Dr. C.A. Bond and Dr. Robert Supernaw, were forced into accepting a contrived "early-tenure" statement as false justification for not recommending Plaintiff Miller for tenure. Had the faculty affairs committee members been free to vote their conscious, they would have recommended that Plaintiff Miller receive tenure.

One of the major criticisms of Plaintiff Miller's tenure application was that it was an "early" tenure application. This was not a problem when male professors went up for early promotion. In fact, the following year, when Dr. Girish Shah and Dr. Mansoor Khan went up for early promotion, the Faculty Affairs Committee was not pressured to vote against their early applications.

After the Faculty Affairs Committee made its recommendation, Dean Nelson recommended that Plaintiff Miller not receive tenure. The reasons asserted by Dean Nelson for this opinion are fabricated justifications to deny Plaintiff Miller tenure. Dean Nelson has never recommended that a woman who went through the full tenure review process at the SOP receive tenure, but he has recommended in favor of tenure and promotion for every man who has gone through the full tenure review process at the SOP.

In December 1998, Plaintiff Miller complained that she was not being paid as much as her male counterparts. In retaliation for making this complaint, Defendant engaged in a pattern of actions designed to make Plaintiff Miller's working environment so unbearable that she was ultimately forced to resign.

In addition to being discriminatorily denied tenure, Plaintiff Miller was also paid less than her male counterparts. Even though she performed substantially the same duties as Dr. Roland Patry, Dr. Charles Siefert, Dr. Mansoor Khan, and Dr. Girish Shah, she was paid less. In fact, in relation to Dr. Shah and Dr. Khan, she held a higher academic rank, but was still paid less.

Plaintiff Miller has suffered damages as a result of discriminatory Defendant's actions, including front pay, back pay, and compensatory damages.

**B.      Summary of Claims of Plaintiff King Miller**

In the spring of 1997, Plaintiff King Miller, a tenured professor at Colorado State University, applied and interviewed for the position of Associate Dean for Outcomes Assessment at the SOP. During the interview process, Plaintiff King Miller inquired about whether there would be any difficulty in her obtaining tenure if she came to the SOP. Dean Nelson informed Plaintiff King Miller that tenure would be no problem and that she would not have to worry about it. Plaintiff King

Miller also inquired about her salary and she was told that Defendant could not pay her more than $70,0000 plus a $5,000 stipend. Finally, during the interview process, Plaintiff King Miller inquired what her responsibilities would be in terms of teaching, scholarship, and grantsmanship because she was concerned that she would have little time for the activities if she was charged with creating an outcomes assessment program at the SOP. She was told that these duties would not be required of her, but that she could teach if she desired.

Ultimately, Plaintiff King Miller accepted a position with the SOP as Associate Dean for Outcomes Assessment and Professor of Pharmaceutical Sciences. Immediately upon her arrival, Plaintiff King Miller was asked to teach several courses, which she did, even though she was told during the interview process that teaching would not be required. Although Plaintiff King Miller was denied tenure on the move, Dean Nelson told Plaintiff King Miller that a decision in favor of tenure would be easy to make if she kept up her previous levels of teaching, service, and scholarship.

During the fall 1997 and spring 1998 semesters, Plaintiff King Miller exceeded all expectations. She was instrumental in the SOP conducting its first ever outcomes assessment exam. In addition, Plaintiff King Miller taught several courses and was responsible for several faculty development programs. Dean Nelson, in a February 1998 evaluation of Plaintiff King Miller, said that Plaintiff King Miller was off to a good start at the SOP. In short, Plaintiff King Miller exceeded her previous levels of performance in teaching, service, and scholarship and, thus, according to Dean Nelson's standard, should have been awarded tenure at the SOP.

In July 1998, Plaintiff King Miller applied for tenure. Plaintiff King Miller's department chair, Dr. Quentin Smith, recommended that Plaintiff King Miller not receive tenure, even though

the following year he recommended that two less qualified males, Dr. Mansoor Khan and Dr. Girish Shah, receive tenure and promotion.

The next step in the tenure review process was the Faculty Affairs Committee vote.  The Faculty Affairs Committee members, who were junior faculty members and students, with the exception of Dr. C.A. Bond and Dr. Robert Supernaw, were forced into accepting a contrived "early-tenure" statement as false justification for not recommending Plaintiff King Miller for tenure.  Had the faculty affairs committee members been free to vote their conscious, they would have recommended that Plaintiff King Miller receive tenure.

Dean Nelson also recommended that Plaintiff King Miller not receive tenure, even though Plaintiff King Miller had exceeded her previous accomplishments in teaching, service, and scholarship.

In early 1999, Plaintiff King Miller complained about salary and tenure inequities at the SOP.

Plaintiff King Miller continued as Associate Dean for Outcomes Assessment and Professor of Pharmaceutical Sciences during calendar year 1999.  She performed all of her duties well.  And, even though she was told she would not be required to teach or publish if she accepted a position at the SOP, she continued to do both during calendar year 1999.

In the spring of 1999, Plaintiff King Miller was diagnosed with Stargardt's disease, a degenerative condition of the eye that eventually leads to blindness.  In July 1999, an optometrist hired by the Texas Commission for the Blind who examined Plaintiff King Miller advised Devona Smith, the Human Resources Director for Defendant, that Plaintiff King Miller suffered from Stargardt's disease and that she would need certain accommodations in order to perform her job.

Instead of working with Plaintiff King Miller so that she could continue to perform at the same high standards, Dean Nelson began demanding medical records from Plaintiff King Miller and certification of her disease by a board-certified ophthalmologist before he would consider requests for accommodation.  Plaintiff King Miller attempted to appease Dean Nelson, but Dean Nelson continued to make unreasonable and unwarranted documentation demands on Plaintiff King Miller. Dean Nelson went so far as to begin documenting instances where he believed Plaintiff King Miller was not acting blind.

In July 1999, Plaintiff King Miller again applied for tenure.  Two male associate professors also applied for tenure during this same period.  Although the two male associate professors were not as qualified for tenure as Plaintiff King Miller, they both received tenure and Plaintiff King Miller did not.  In addition, both male associate professors requested and received early promotion to full professor, even though there was mixed support for their promotions to full professors.

Throughout calendar year 1999 and 2000, Defendant continued to drag its feet in providing Plaintiff King Miller adaptive equipment and physical plant modifications to allow her to perform her job at the same high level as she always had.  In January 2000, Plaintiff King Miller, Dean Nelson, Dr. Quentin Smith, and David Fry, Defendant's ADA coordinator, met in an attempt to resolve the problems associated with Defendant providing reasonable accommodations. Despite this meeting and Defendant's assertions that it would work to help to meet Plaintiff King Miller's needs, it took over a year for Defendant to implement many simple accommodation requests, and some accommodation requests were never implemented.

On January 10, 2000, Dean Nelson advised Plaintiff King Miller that he was demoting her from her position as Associate Dean for Outcomes Assessment.  This demotion was in spite of the

fact that Plaintiff King Miller was doing an outstanding job as Associate Dean for Outcomes Assessment. In fact, in the fall of 1999, Plaintiff King Miller had met with colleagues at the University of Colorado about creating a national center of excellence for outcomes assessment in pharmacy education based on the outcomes assessment model she had created.

During calendar year 2000 and 2001, Plaintiff King Miller continued to suffer continuing vision deterioration, and Defendant continued to delay providing Plaintiff King Miller with even the most rudimentary accommodations. In addition, Dr. Quentin Smith, Plaintiff King Miller's department chair, began placing additional duties on Plaintiff King Miller that he did not place on other non-disabled faculty. Dr. Smith began requiring Plaintiff King Miller to report her comings and goings, but did not require that of other non-disabled faculty members. In addition, Dr. Smith began having department secretaries record when Plaintiff King Miller was in her office. Finally, Dr. Smith also made it unduly burdensome for Plaintiff King Miller to obtain approval from the SOP to take needed braille classes. Eventually, he relented and allowed Plaintiff King Miller to take Braille classes over her lunch break.

In August 2001, Plaintiff King Miller was terminated. Even after her termination, she continued to be harassed. Plaintiff King Miller applied for long-term disability, but Defendant failed to cooperate with the insurance company, which resulted in Plaintiff King Miller's long-term disability payments being delayed.

C. **Defendant's Summary of the Claims and Defenses**

Plaintiffs Lucinda Miler and Elaine –King Miller each claim that they were denied tenure on the basis of sex and retaliated against in violation of Title VII and the Texas Labor Code. Both Plaintiffs claim that they were paid less than males in violation of Title VII and the Equal Pay

Act. Plaintiff King-Miller alone brings a claim of disability discrimination under section 504 of the Rehabilitation Act of 1973 and the Texas Labor Code. Both Plaintiff's are requesting punitive and compensatory damages, back pay and costs.

Defendant denies that it discriminated or retaliated against the Plaintiffs in any manner, shape or form. Plaintiffs were not awarded tenure because there was insufficient documentation or demonstration of competence and excellence by the Plaintiffs while they were at the School. The credentials of the Plaintiffs were well regarded at every level of review, but substantially derived from performance before their arrival at the School rather than demonstrating their competence and excellence at the School, an explicitly stated criteria for tenure.

Defendant asserts that King-Miller was denied tenure twice due to her lack of demonstrated and documented competence and excellence. After her second application did not result in an award of tenure, she thereafter received -- in accordance with Board of Regents policy -- a one-year terminal contract. Defendant maintains that Lucinda Miller precipitously resigned without justification or cause, and denies that "conditions at the School" were so "intolerable" that a reasonable person would have felt *compelled* to resign.

Defendant further asserts that Plaintiffs were not similarly situated to their putative comparators, and they were not considered for tenure under "nearly identical circumstances." Finally, Defendant asserts that it would have made the same decisions even in the absence of any protected activity.

Defendant further asserts that Plaintiffs were not similarly situated to their putative comparators in terms of salary, and that neither Miller or King Miller were paid less salary than

similarly situated men doing the same or substantially similar work.  Further, any salary disparity between Miller and King Miller and similarly situated men were based on factors other than sex.

Finally, Defendant asserts that it would have made the same decisions regarding tenure, salary, administrative assignments and reassignments and determining and providing reasonable accommodations even in the absence of any protected activity by Miller or King Miller, or both.

Defendant also asserts that Plaintiff King-Miller requested and received various reasonable accommodations related to her disability.  Defendant denies that it failed to either work with King Miller to determine the level of her disability, if any, and/or the necessary reasonable accommodations, if any, to be afforded her.  Defendant further denies that it failed to provide accommodations for King Miller's disability.  Defendant denies that King Miller was subjected to any hostile work environment because of her disability, and to the extent that King Miller is permitted to present evidence on such unpleaded claim, Defendant denies retaliating against King Miller because of any protected activity related to her disability.  Defendant maintains that King Miller was removed from her administrative assignment as associate dean for performance reasons, and not for any reason related to any disability.

### III. STIPULATIONS AND ADMISSIONS
### OF FACT AGREED UPON BY THE PARTIES

1.     Plaintiff Lucinda Miller and Plaintiff Elaine King Miller are female.

2.     Plaintiff Miller was a Professor of Pharmacy Practice at the Texas Tech School of Pharmacy ("SOP") from August 1997 until March 24, 1999.

3.     Plaintiff Miller tendered her resignation on February 22, 1999.

4.      Plaintiff King Miller was a Professor of Pharmaceutical Sciences at the SOP from August 1997 until August 31, 2001.  From August 1997 to January 31, 2000, Plaintiff King Miller was Associate Dean for Outcomes Assessment.

5.      Dr. Arthur Nelson is the Dean of the SOP and has held such position at all times relevant to this action.

6.      Dr. Cynthia Raehl is the Chairperson of the Pharmacy Practice Department at the SOP and has held such position at all times relevant to this action.

7.      Dr. Quentin Smith is the Chairperson of the Pharmaceutical Sciences Department of the SOP and has held such position at all times relevant to this action.

8.      In March 1997, Plaintiff Miller accepted a position as a Professor of Pharmacy Practice with the SOP.  She began her duties at the SOP in August 1997.

9.      Plaintiff King Miller joined the faculty in August 1997.

10.     Plaintiffs were both appointed as full professors without tenure but on the tenure track.

11.     Plaintiff Miller applied for tenure in July 1998.

12.     The Guidelines for Appointment, Promotion, and Tenure of Tenure Track Faculty in the Pharmacy Practice Department Faculty at the SOP state that:

> Tenure will be earned by those faculty who have: (1) demonstrated excellence in teaching, *and* (2) demonstrated excellence in either scholarly activity OR pharmacy practice; proficiency must be demonstrated in both scholarly activity and pharmacy practice, however excellence need only be demonstrated in one of these areas, *and* (3) demonstrated minimal competency in academic or public service as expected of all School of Pharmacy faculty, *and* (4) an earned national reputation as documented by external peer review. **In short, tenure demands demonstration of excellence in teaching <u>and</u> excellence in either scholarly activity OR pharmacy practice <u>and</u> a documented national reputation.**  It is expected that in order to earn a national reputation, Pharmacy Practice faculty will have made a meaningful and

measurable contribution to the professional or scientific literature. (Emphasis in original).

13.    Plaintiff King Miller applied for tenure in July 1998.

14.    Pursuant to policy and practice, Plaintiff King Miller did not have a departmental review in 1998-1999 within the Department of Pharmaceutical Sciences because there were no tenured faculty in the Department of Pharmaceutical Sciences at that time, other than her department chair.

15.    The Guidelines for Promotion and Tenure of Tenure-Track Faculty in the Department of Pharmaceutical Sciences state that:

> Promotion and/or tenure of faculty within the Pharmaceutical Sciences Department
> is contingent upon demonstrated and documented performance in three major areas:
> (1) teaching, (2) research/scholarly activity, and (3) service (academic and public).
> . . .
> Tenure may be recommended only for those faculty who have demonstrated to their
> peers and institutional administrators satisfactory competence (proficiency) in all
> three academic areas with promises of excellence in teaching or research.

16.    The members of the Faculty Affairs Committee for the 1998-1999 tenure review cycle were: (1) Dr. Robert Supernaw, (2) Dr. C.A. Bond, (3) Dr. Machelle Manual, (4) Dr. Aaron Killian, (5) Dr. Jim Stoll, (6) Student member Mandy Jackson, and (7) Student member Allison Fletcher.

17.    Each professor at the Faculty Affairs Committee had one vote, and the students had half a vote each.

18.    Dr. Girish Shah and Dr. Mansoor Khan are members of the Pharmaceutical Sciences Department at the SOP.

19.    Dr. Charles Siefert is a full professor in the Pharmacy Practice Department.

20.    Pursuant to Board of Regents policy Plaintiff Elaine King Miller was given a one-year terminal contract and she concluded her employment at the School in August 2001.

21.     Plaintiffs each filed complaints with the EEOC on April 15, 1999.

22.     They each received right to sue letter from the EEOC on or about August 19, 2000.

23.     Plaintiff King-Miller filed a second charge with the EEOC in March 2000, and received a right to sue letter on that charge on March 27, 2001.

24.     Plaintiff filed suit November 3, 2000.

25.     Defendant is an independent institution of higher education governed by the Board of Regents of Texas Tech University and employs more than 500 people.

## IV.  CONTESTED ISSUES OF FACT

### A.     Contested Issues of Fact of Plaintiff Miller

1.     Whether in October 1996, Plaintiff Miller was asked by Dr. Raehl of the SOP to interview for an academic position with the SOP.  Dr. Raehl told Plaintiff Miller that she had contacted Plaintiff Miller because Dr. Raehl had read an article in which Plaintiff Miller was one of the authors.  At the time Dr. Raehl contacted Plaintiff Miller, Plaintiff Miller was an Associate Professor of Pharmacy at the Nebraska School of Pharmacy.  After further discussions between Dr. Raehl and Plaintiff Miller, Dr. Raehl asked Plaintiff Miller to interview for a professor position at the SOP?

2.     Whether even though Plaintiff Miller was told by both Dr. Raehl and Dr. Nelson that she would be on the tenure track, Dr. Raehl signed a Personal Action Form listing Plaintiff Miller as non-tenure track, and Dr. Nelson sent a memorandum to the President of TTUHSC stating that Plaintiff Miller was on a non-tenure track?

3.     Whether Defendant, through its agents or officers, assured Plaintiff Miller that she would be granted tenure if she accepted a position as full professor at the SOP?

4.     Whether Plaintiff Miller met the standards for tenure at the SOP in relation to the other male applicants who were awarded tenure or promotion?

5.     Whether Defendant's asserted reasons for denying Plaintiff Miller tenure are worthy of belief?

6.     Whether Defendant made conditions so unbearable for Plaintiff Miller that she was forced to resign her position with the SOP?

7.     What damages did Plaintiff Miller suffer because of the denial of tenure, including compensatory damages, front pay, and back pay?

8.     Whether Plaintiff Miller complained of discriminatory practices at the SOP?

9.     Whether Plaintiff Miller was retaliated against because she complained about discriminatory practices at the SOP?

10.     What damages did Plaintiff Miller suffer because of the retaliation in terms of compensatory damages, front pay, and back pay?

11.     What damages did Plaintiff Miller suffer because of her constructive discharge, including compensatory damages, front pay, and back pay?

12.     Whether Plaintiff Miller had substantially similar duties to Professor Roland Patry, Professor Charles Seifert, Professor Mansoor Khan, and Professor Girish Shah in relation to her duties as a professor?

13.     Whether Plaintiff Miller received the same salary and benefits as similarly situated male employees at the SOP?

14.     What damages did Plaintiff Miller suffer because she did not receive the same salary and benefits as male employees with substantially similar job duties at the SOP?

15.     Whether Plaintiff Miller is entitled to injunctive relief for the unlawful sex discrimination, constructive discharge, and retaliation she suffered?

16.     What prejudgment and post-judgment interest is Plaintiff Miller entitled to?

17.     What are reasonable and necessary costs and attorneys' fee for the services rendered in this case by Plaintiff Miller's attorneys through trial and on appeal?

18.     Whether the tenure review process within the School of Pharmacy includes four levels of review. The first level of review consists of the review of the applicant's tenure dossier by the tenured members of the applicant's department. The second level of review is a review by the applicant's departmental chair. The third level of review is by the school-wide Faculty Affairs Committee. The fourth level of review is by the Dean of the SOP?

19.     Whether Plaintiff Miller was reviewed at these four levels of review within the School of Pharmacy?

20.     Whether Dr. Raehl recommended that Plaintiff Miller not receive tenure?

21.     Whether Dean Nelson recommended that Plaintiff Miller not receive tenure?

22.     Whether Plaintiff Miller did not receive tenure during the 1998-1999 tenure review cycle?

23.     Whether Dr. Roland Patry was awarded tenure during the 1998-1999 tenure review cycle?

24.     While employed at the SOP, Plaintiff Miller was Interim Associate Dean of Clinical Research from August 1997 to September 1998. Plaintiff Miller was also Vice Chair of Pharmacy Practice while employed at the SOP

**B.     Contested Issues of Fact of Plaintiff King Miller**

1.      Whether In April 1997, Plaintiff King Miller contacted Dr. Raehl to inquire about a job announcement for a position as Associate Dean for Student Outcomes Assessment at the SOP. Dr. Raehl asked for and received Plaintiff King Miller's curriculum vitae.  Shortly thereafter, Dr. Arthur Nelson contacted Plaintiff King Miller and asked her to come to Amarillo to interview for the Associate Dean position, which Plaintiff King Miller agreed to do?

2.      Whether Plaintiff Miller accepted the position as Associate Dean for Outcomes Assessment with the SOP in the spring of 1997 and began her duties at the SOP in August 1997?

3.      Whether her tenure review within the SOP during the 1998-1999 tenure review cycle consisted of review by the department chair, Dr. Quentin Smith, review by the school-wide Faculty Affairs Committee, and review by the Dean of the SOP?

4.      Whether Dr. Quentin Smith recommended that Plaintiff King Miller not receive tenure in the 1998-1999 tenure review cycle?

5.      Whether Dean Nelson recommended that Plaintiff King Miller not receive tenure in the 1998-1999 tenure review cycle?

6.      Whether Plaintiff King Miller did not receive tenure during the 1998-1999 tenure review cycle?

7.      Whether Defendant, through its agents or officers, assured Plaintiff King Miller that she would be granted tenure if she accepted a position as full professor and Associate Dean for Outcomes Assessment at the SOP?

8.      Whether Plaintiff King Miller met the standards for tenure at the SOP in relation to the other male applicants who were awarded tenure or promotion?

9.      Whether Defendant's asserted reasons for denying Plaintiff King Miller tenure are worthy of belief?

10.     Whether Defendant's asserted reasons for demoting Plaintiff King Miller from her position as Associate Dean for Outcomes Assessment are worthy of belief?

11.     What damages did Plaintiff King Miller suffer because of the denial of tenure, including compensatory damages, front pay, and back pay?

12.     Whether Plaintiff King Miller was able to perform the essential functions of her position as Associate Dean for Outcomes Assessment and Professor of Pharmaceutical Sciences with or without reasonable accommodations?

13.     When was Defendant put on sufficient notice that Plaintiff King Miller was an individual with a disability such that it had an obligation under the Rehabilitation Act to engage in the accommodation process in good faith?

14.     Whether Defendant provided Plaintiff King Miller reasonable accommodation?

15.     What damages did Plaintiff King Miller suffer because of Defendant's failure to provide her reasonable accommodations, including compensatory damages, front pay, and back pay?

16.     Whether Plaintiff King Miller was subject to a hostile work environment based on her disability?

17.     What damages did Plaintiff King Miller suffer because of being subject to a hostile work environment based on disability, including front pay, back pay, and compensatory damages?

18.     Whether Plaintiff King Miller was retaliated against by the SOP because she complained about discriminatory practices occurring at the SOP?

19.     What damages did Plaintiff King Miller suffer because of Defendant's retaliation, including front pay, back pay, and compensatory damages?

20.     Whether Plaintiff King Miller had substantially similar duties to Professor Roland Patry, Professor Charles Seifert, Professor Mansoor Khan, and Professor Girish Shah in relation to her duties as a professor?

21.     Whether Plaintiff King Miller received the same salary and benefits as male employees with substantially similar job duties?

22.     What damages did Plaintiff King Miller suffer because she did not receive the same salary as males with substantially similar job duties, including front pay, back pay, and compensatory damages?

23.     Whether Plaintiff King Miller is entitled to injunctive relief for the unlawful sex discrimination, disability discrimination, and retaliation she suffered?

24.     What prejudgment and post-judgment interest is Plaintiff King Miller entitled to?

25.     What are reasonable and necessary costs and attorneys' fees for the services rendered in this case by Plaintiff King Miller's attorneys through trial and on appeal?

26.     Whether Plaintiff King Miller applied for tenure during the 1999-2000 tenure review cycle, but was again denied tenure?

27.     Whether Dr. Girish Shah was awarded tenure and promoted from Associate Professor to Full Professor during the 1999-2000 tenure review cycle?

28.     Whether Dr. Mansoor Khan was awarded tenure and promoted from Associate Professor to Full Professor during the 1999-2000 tenure review cycle?

29.     Whether Dr. Girish Shah was given two years credit toward promotion and tenure when he accepted a position as Associate Professor with the SOP?

30.     Whether Dr. Mansoor Khan was given two years credit toward promotion and tenure when he accepted a position as Associate Professor with the SOP?

31.     Whether Dr. Charles Siefert was awarded tenure during the 2000-2001 tenure review cycle?

32.     Whether In July 1999, Dr. William Townsend, O.D., wrote a letter to Devona Smith, the Human Resources Manager for SOP, in which he advised her that Plaintiff King Miller had Stargardt's diseases, a disease of the eye that leads to blindness?

33.     Whether On January 28, 2000, Plaintiff King Miler, Dean Nelson, Dr. Quentin Smith, and David Fry met regarding Plaintiff King Miller's reasonable accommodation needs?

34.     Whether Plaintiff King Miller was on medical leave from the SOP from September 19, 2000 to December 8, 2000?

35.     Whether Plaintiff King Miller was removed from her position as Associate Dean for Outcomes Assessment on February 1, 2000?

36.     Whether Dr. Robert Supernaw assumed the duties of Associate Dean for Outcomes Assessment after Plaintiff King Miller was removed as Associate Dean for Outcomes Assessment?

37.     Whether the SOP has an Outcomes Assessment Committee, and at all times relevant to this action, Dr. Cynthia Raehl and Dr. Quentin Smith were members of the Outcomes Assessment Committee?

38.     Whether Plaintiff King Miller was terminated from her employment with the SOP on August 31, 2001?

39.     The first outcomes assessment exam conducted while Plaintiff King Miller was at the SOP was conducted in January 1998.  This outcomes assessment exam was in a videotape format?

40.     The second outcomes assessment exam, which was a multiple choice exam, was conducted in March 1999?

41.     The last outcomes assessment exam conducted at the SOP while Plaintiff King Miller was still Associate Dean for Outcomes Assessment was conducted in January 2000?

**C.      Defendant's Contested Questions of Fact**

1.      Whether Plaintiffs were subjected to an adverse employment action for Title VII retaliation purposes by being denied early tenure.

2.      Whether or not the Defendant discriminated against the Plaintiffs because of their gender by declining to grant them tenure.

3.      Whether the Defendant discriminated against the Plaintiffs under Title VII with respect to their compensation.

4.      Whether Miller and King-Miller's have each been employed by Texas Tech University Health Sciences Center each doing substantially equal work on a job or jobs, the performance of which requires substantially equal skill, effort, and responsibility as jobs held by similarly-situated men, and receiving less compensation for that work.

5.      Whether the job or jobs performed by the Plaintiffs were performed under working conditions similar or substantially the same as their male comparators.

6.      Whether Miller and King-Miller have been paid lower wages than men doing equal work.

7.      Whether either of the Plaintiffs were denied tenure in retaliation for complaining about a gender based salary disparity.

8.      Whether Plaintiffs were paid less than other similarly situated male faculty because of their sex.

9.      Whether Texas Tech University Health Sciences Center paid Plaintiffs less in accordance with a seniority system, a merit system, or on some other basis than sex.

10.     Whether Patry received tenure under circumstances "nearly identical" to Miller, who was not recommended for tenure.

11.     Whether Patry, Shah, Khan, and or Seifert are valid comparators to the Plaintiffs.

12.     Whether or not Defendant was retaliating against Plaintiff King-Miller when she was administratively reassigned.

13.     Whether Plaintiff Miller's working conditions were so intolerable that a reasonable employee would feel compelled to resign.

14.     Whether or not the accommodations that Plaintiff King-Miller received were reasonable.

15.     Whether anyone involved at any level of the tenure review process was aware that King-Miller had filed an EEOC complaint prior to her last tenure review cycle.

16.     Whether anyone involved at any level of the tenure review process was aware of Miller's complaint concerning salary inequity before they made their recommendations concerning her tenure application.

17.     Whether anyone involved at any level of the tenure review process was aware of King Miller's complaint concerning salary inequity before they made their recommendations concerning her tenure application.

18.     Whether Plaintiff King-Miller was told of her deficient job performance prior to her disclosure of her disability.

19.     Whether Plaintiff King-Miller had demonstrated prior to her disclosure of her disability that she was not qualified for the position.

20.     Whether Plaintiffs failed to mitigate damages, if any.

## V.  CONTESTED ISSUES OF LAW[1]

### A.     Contested Issues of Law of Plaintiff Miller

1.     Whether Plaintiff Miller must prove "pretext plus" to prevail under her Title VII or Texas Commission on Human Rights Act ("TCHRA") claims?

2.     Whether Defendant willfully paid Plaintiff Miller less than her male comparators?

3.     Whether Plaintiff Miller was denied tenure in violation of Title VII and/or the TCHRA?

4.     Whether the reasons asserted for denying Plaintiff Miller tenure were pretextual?

5.     What damages is Plaintiff Miller entitled to under Title VII and/or the TCHRA?

6.     Whether Plaintiff Miller is entitled to attorneys' fees and costs under Title VII and/or the TCHRA and the Equal Pay Act?

7.     Whether Defendant made conditions so intolerable for Plaintiff Miller that she was constructively discharged from her position at the SOP?

---

[1]  All questions of law are also submitted as questions of fact, and vice versa.

8. Whether Plaintiff Miller engaged in protected activity under Title VII?

9. Whether Plaintiff Miller has shown that a causal connection exists between the protected activity in which she engaged and the adverse employment action which she suffered?

10. Whether Dr. Mansoor Khan, Dr. Girish Shah, Dr. Charles Siefert, and Dr. Roland Patry are valid comparators to Plaintiff Miller for purposes of the Equal Pay Act?

11. Whether Plaintiff Miller was paid less than her male comparators?

12. What damages is Plaintiff Miller entitled to under the Equal Pay Act?

13. Whether Plaintiff Miller is entitled to injunctive relief for unlawful sex and discrimination and retaliation?

**B. Contested Issues of Law of Plaintiff King Miller**

1. Whether Plaintiff King Miller must prove "pretext plus" to prevail under her Title VII or TCHRA claims?

2. Whether Plaintiff King Miller was denied tenure in violation of Title VII and/or the TCHRA?

3. Whether the reasons asserted for denying Plaintiff King Miller for denying tenure were pretextual?

4. Whether Defendant's demotion of Plaintiff King Miller from her position as Associate Dean for Outcomes Assessment violated Title VII, the TCHRA, or the Rehabilitation Act?

5. What damages is Plaintiff King Miller entitled to under Title VII and/or the TCHRA?

6. Whether Plaintiff King Miller is entitled to attorneys' fees and costs under Title VII and/or the TCHRA, the Equal Pay Act, and the Rehabilitation Act?

6.      Whether Plaintiff King Miller is an individual with a disability under the Rehabilitation Act?

7.      Whether the Rehabilitation Act requires that a person's claim of blindness be confirmed by a board-certified ophthalmologist?

8.      Whether Defendant could demand that Plaintiff King Miller produce her medical records supporting her diagnosis even after she had provided a letter from an optometrist establishing her diagnosis of Stargardt's disease?

9.      Whether Defendant provided reasonable accommodations for Plaintiff King Miller as required under the Rehabilitation Act?

10.     Whether Defendant engaged in the good faith accommodation process required by the Rehabilitation Act?

11.     Whether Defendant created a hostile work environment for Plaintiff King Miller because of her disability?

12.     What damages is Plaintiff King Miller entitled to under the Rehabilitation Act for Defendant's discriminatory actions against Plaintiff King Miller, including, but not limited to, Defendant's failure to accommodate Plaintiff King Miller's disability and creating a hostile work environment because of her disability?

13.     Whether Plaintiff King Miller engaged in protected activity under Title VII?

14.     Whether Plaintiff King Miller engaged in protected activity under the Rehabilitation Act?

15.     Whether Plaintiff King Miller was retaliated against for engaging in protected activity under Title VII?

16.     Whether Plaintiff King Miller was retaliated against for engaging in protected activity under the Rehabilitation Act?

17.     Whether Plaintiff King Miller has shown that a causal connection exists between the protected activity in which she engaged and the adverse employment action which she suffered?

18.     Whether Dr. Mansoor Khan, Dr. Girish Shah, Dr. Charles Siefert, and Dr. Roland Patry are valid comparators to Plaintiff King Miller for purposes of the Equal Pay Act?

19.     Whether Plaintiff King Miller was willfully paid less than her male comparators?

20.     What damages is Plaintiff King Miller entitled to under the Equal Pay Act?

21.     Whether Plaintiff King Miller is entitled to injunctive relief for unlawful sex and disability discrimination and retaliation?

C.     **Defendant's Contested Propositions of Law**

1.     Whether Plaintiffs have established a casual connection or nexus between their protected activity and the denial of tenure.

2.     Whether King Miller has established a casual connection or nexus between her protected activity and her administrative reassignment.

3.     Whether information concerning Patry, Khan and Shah, and Seifert are relevant to the Plaintiffs Title VII and Texas Labor Code discrimination claims, and/or whether those males are valid comparators to the Plaintiffs in regard to their claims under Title VII and the Equal Pay Act.

4.     Whether either or both Plaintiffs have established a prima facie case of discrimination on the basis of sex regarding their denial of tenure.

5.     Whether either or both Plaintiffs have established a prima facie case of retaliation.

6.      Whether either or both Plaintiffs have established that they were compensated less than similarly situated males for equal work under the same conditions.

7.      Whether the Defendant has articulated legitimate nondiscriminatory reasons for the actions it took of which Plaintiffs complain, particularly in regard to Plaintiffs' application for tenure, and King Miller's administrative reassignment.

8.      Whether Plaintiffs have established that "but for" their protected activity, they would have been granted tenure.

9.      Whether King Miller is "otherwise qualified" as defined in the Rehabilitation Act or federal regulations implementing the Act.

10.     Whether Miller was constructively discharged.

11.     Whether Plaintiffs can recover punitive damages against the state in a suit brought under Title VII.

12.     Whether the Court has subject matter jurisdiction over Plaintiffs' Texas Labor Code sex discrimination and retaliation claims, and Plaintiff King-Miller's Texas Labor Code disability discrimination claim.

13.     If the Court has jurisdiction over any of the Plaintiffs' Texas Labor Code claims, whether Plaintiffs may recover punitive damages against the state in a suit brought under Texas Labor Code.

14.     Whether a state's receipt of federal funds constitutes a valid waiver of Defendant's Eleventh Amendment Immunity from suits brought under section 504 of the Rehabilitation Act.

15.     Whether Dr. Bond's administrative reassignment and its circumstances are relevant to Plaintiffs' discrimination claims.

## VI.  ESTIMATED LENGTH OF TRIAL

Between five (5) and seven (7) days.

## VII.  ADDITIONAL MATTERS

1.      Attached hereto as Exhibit "A" are Plaintiffs' and Defendant's *Proposed Jury Charge and Interrogatories*.

2.      Defendant also attaches as Exhibit B Defendant's *Motion In Limine* hereto and incorporates herein as filed with this *Joint Pretrial Order*.

3.      Plaintiffs object to attaching Defendant's *Motion In Limine,* and believe should be struck for failing to comply with the Local Rules.  Plaintiffs are attaching Defendant's *Motion In Limine* hereto at the request of Defendant's counsel.

C \WINDOWS\TEMP\Pretrial Order-revised.wpd

**JOINT PRETRIAL ORDER**                                                          **Page 27 of  27**

Approved this _____ day of _____, 2002.

_____
HON. MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM:

_____
**BRADLEY W. HOWARD**
**GRANT A. BANNEN**
Counsel for Plaintiff

Date:_____

_____
**DAVID E. JENKINS**
**RAMONA FRAZIER**
Counsel for Defendant

Date:_____

The attached Pretrial Order is approved with the following modifications:

1.  The only motions pending at this time are:

    a)  Plaintiffs' motion *in limine*, and

    b)  Defendant's motion *in limine*.

2.  The Court does not approve of attaching pleadings as exhibits to proposed pretrial orders.  The parties' proposed jury instructions and questions and Defendant's motion *in limine* have therefore been detached.  Counsel are to file those pleadings separately.

It is SO ORDERED.

Signed this the ___16th___ day of February, 2002.


_____
MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE